1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES ANTHONY DIESSO,

11            Petitioner,              No. CIV S-03-2485 LKK KJM P

12      vs.

13   KNOWLES, Warden,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  He challenges his Solano County conviction for murder,

18   possession of a weapon by a prisoner, battery by a prisoner, the findings that he had two prior

19   serious felony convictions and that he had served a prior prison term as well as the resulting

20   sentence of 135 years to life.

21   I.  Background

22            The state Court of Appeal's thorough factual summary is fairly supported by the

23   record:

24            *Guilt Phase*

25            During the guilt phase of the trial, the prosecution presented the
             following testimony.  In June 1998, defendant was a prisoner at
26           CMF and was housed in the "I" wing in cell 308 with Jeffrey Ford.

1

The I wing houses prisoners with a psychiatric history who have had problems in the prison system.  On June 29, just before 4:00 a.m., Lieutenant Michael Ross found defendant in his cell banging on the door and saying something Ross could not understand; the cell was dark and Ross had a hard time seeing inside.  He saw what appeared to be blood on defendant's forehead.  Defendant moved away from the cell door and Ross saw him grab his cellmate and toss him off the lower bunk and into the wall, after which Ford fell on the floor.  Defendant said, "Get it out of here."

Ross testified that when defendant was taken out of the cell, he was covered in blood and had a "wide-eyed look."  Investigating officers entered the cell and found that Ford was dead; his body was lying face down against the wall.  There were bloody handprints all over the walls and trash and other items strewn about the cell.  The autopsy revealed that Ford died from ligature strangulation and blunt force trauma to the head.

Later on the same day, June 29, 1998, two other incidents occurred.  First, after defendant was removed from his cell in the early morning he was placed in a medical examination room, where the correctional officers decided to change his restraints.  In the course of the transfer of the handcuffs, defendant broke away and hit one of the officers in the face, knocking him down and knocking another officer into the wall.  Both were briefly rendered unconscious.  In the afternoon, two officers from the Investigative Services Unit went to talk to defendant.  They found two other officers trying to persuade defendant to give up a razor blade he had in his possession.  Instead, defendant took the razor blade, wrapped some plastic around it, placed it in his mouth, took a drink from a milk carton and swallowed the razor blade.

Defendant made several statements about these incidents.  On July 3, 1998, he told one officer that he was "trippin" and "that was not him," but he did not say to which incident he was referring.  Also on July 3, he told another officer that he did not recall what happened on the day of the murder, but only remembered being escorted down the hallway from his cell with blood all over him.  On July 7, a correctional officer overheard defendant talking with another inmate, Nicholas Mecca.  Defendant bragged about swallowing the razor blade and bragged that he had sent two officers to the hospital.

In late December 1998, defendant asked to speak to the Investigative Services Unit and requested an interview with the District Attorney's office.  In January 1999, he provided a written confession and verbally confessed, giving details of the murder of his cellmate Jeffrey Ford.

Several inmates testified about defendant's behavior both before and after Ford's murder.  James Deckard had previously been defendant's cellmate, and had asked to be moved because

2

defendant kept Deckard up all night talking to himself, and walking around.  Deckard thought defendant was not in control of his faculties.  He testified that when defendant was not receiving his medication, he was uncontrollable.  Before the murder defendant told Deckard that he was planning on killing another inmate by choking him, and that he intended to put blood and satanic signs on the wall so that he would be sent to the mental hospital at Atascadero based on a not guilty by reason of insanity verdict.  Deckard also testified that defendant had a tattoo saying "NLR" which stood for "Nazi Low Riders," a person "that doesn't like any other race but himself."  However, Deckard did not think that defendant was affiliated with that group.

Another inmate, Ray Ochoa, had been housed with defendant on previous occasions before Ford was killed.  Ochoa testified that defendant had mood changes, talked to himself and walked around aimlessly.  On one occasion defendant told Ochoa he was dressing like a girl in order to make himself appear mentally ill.  He also told Ochoa how to swallow razor blades, how to go on a hunger strike, how to overdose on medication and how to otherwise fake symptoms of mental illness.  Defendant said he was going to kill an inmate called Stephanie by strangling him and that he would go to the mental hospital afterwards because he was going to put things on the wall with blood and act crazy.  Ochoa testified that on the night of the killing, defendant was trying to get the officers's attention and the officer did not respond to him.  Ochoa saw defendant come out of his cell the night of the murder, and he testified that defendant seemed "out of it."

A third inmate, Nicholas Mecca, was housed in the Administrative Segregation wing of CMF when defendant was housed there after June 29.  Mecca testified that defendant told him he had killed a "punk," meaning a homosexual.  He asked Mecca to testify that he (defendant) was "having psych problems" and was crazy.  He told Mecca that the killing did not have anything to do with psychological problems and that he never had a psychotic break, but he wanted Mecca to help him make it seem that was what had happened.  Mecca testified that a few days before the killing, defendant told him he was going to kill a punk with a razor blade he had received from another inmate.  At some point in time defendant told Mecca that "he was gonna do it" in order to become a Nazi Low Rider.

During the guilt phase, the defense called two mental health experts.  Dr. Dean Clair, a psychologist, reviewed records but was unable to meet with defendant because he refused to submit to an interview.  In May 1997, Dr. Clair had interviewed defendant for a prior offense and had concluded at that time that defendant was *not* psychotic.  Based on his past contact with defendant and on the files he reviewed for the current offense, Dr. Clair's opinion was that as of the date of the current offense defendant *was* psychotic as

a result of an organic mental disorder.  Dr. Clair's opinion was based in part on defendant's history of seizure disorder with blackouts, resulting from childhood brain trauma.

Dr. Herb McGrew, the second mental health expert called by the defense, was appointed by the court to evaluate the defendant.  Dr. McGrew, a psychiatrist, had evaluated defendant once for a prior offense and twice for the current offense.  The first time he evaluated defendant, in 1997, Dr. McGrew found him incompetent to stand trial, and defendant was sent to Atascadero.  As to the current offense, Dr. McGrew's opinion was that defendant "was extremely and extraordinarily disturbed" and likely psychotic at the time of the murder.  However, Dr. McGrew also testified that he felt that defendant was manipulative, and he questioned whether defendant was giving accurate information.

Defense counsel argued that at the time of the murder defendant was suffering from a mental disease or defect that rendered him incapable of forming the requisite intent to commit murder.  The jury found defendant guilty on all counts.  At the reading of the verdicts defendant made a verbal outburst and pushed over counsel table, and was removed from the courtroom.

### Sanity Phase

The parties stipulated that the jury could consider all of the guilt phase evidence during the sanity phase.  At the sanity phase the same doctors returned to the stand.  Dr. Clair testified that in his opinion defendant was legally insane at the time of the murder.  He based his opinion in part on the fact that defendant suffered from a convulsive disorder, and people with such disorders often have uncontrollably violent episodes in which they lose the ability to distinguish right from wrong.  Moreover, defendant had a history of instability and violent acting out and might not have been taking his medication.  The fact that defendant killed his cellmate "under circumstances where it would be inescapable that he would be charged with that" suggested an inability to link behavior and consequences.  He found defendant's behavior in general to be totally irrational.  He also noted that in the period leading up to the crime, defendant had been telling others that voices were tormenting him.  From the fact that defendant acted coherently both before and after the murder, Dr. Clair concluded that defendant is "transiently psychotic."  He opined that all indications were that defendant was not in control of himself at the time of the murder.

Dr. McGrew also testified that defendant was legally insane at the time of the murder.  He believed that at the time of these offenses defendant was not capable of making any rational decision about whether killing Ford was right or wrong.  The prosecutor suggested the murder was rational because it was gang-related.  Dr. McGrew

could only guess that defendant did not commit the murder for gang-related reasons, but because he was out of control.

The defense called Dr. Stephen Estner, a board certified psychiatrist, appointed by the court.  Based on his examination of defendant and his review of the records Dr. Estner concluded that at the time of the murder defendant met the criteria for legal insanity in that he was unable to distinguish right from wrong.  Dr. Estner also testified that people with mental illness can fluctuate to the point where they are lucid before and after a crime but insane at the time the crime is committed.

Michael Pappa, a captain with the Department of Corrections, testified for the prosecution about defendant's arraignment hearing, during which appellant lunged at his attorney and "head-butted" him, and then spit on the bailiff.  The court had defendant removed from the public courtroom and held in a secure cell adjacent to the courtroom, where the court questioned defendant, who did not respond to the court's questions.  A week later, the court again attempted to arraign defendant, who once again refused to speak.  When the court explained it could not accept defendant's not guilty by reason of insanity plea unless defendant personally entered the plea, defendant responded to the court's questions and entered his plea.

Officer Fermin Rubio testified to an incident in 1997 where defendant stabbed another inmate 17 times because the inmate had called defendant "a snitch."  Rubio testified that the inmate had the reputation as an "effeminate homosexual."  He also testified to an in-court incident in April 1999, where defendant lunged at and attempted to assault his attorney.

Answer, Ex.  A (Court of Appeal opinion) at 3-8.

II.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is

---

[1]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1

2

> objectively unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

3   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

4   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

5   fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

6   (2002).

7           The court will look to the last reasoned state court decision in determining

8   whether the law applied to a particular claim by the state courts was contrary to the law set forth

9   in the cases of the United States Supreme Court or whether an unreasonable application of such

10  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

11  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

12  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

13  must perform an independent review of the record to ascertain whether the state court decision

14  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

15  words, the court assumes the state court applied the correct law, and analyzes whether the

16  decision of the state court was based on an objectively unreasonable application of that law.

17          It is appropriate to look to lower federal court decisions to determine what law has

18  been "clearly established" by the Supreme Court and the reasonableness of a particular

19  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

III.  Petitioner's Request To Represent Himself

    A.  Background

        During the course of pretrial proceedings, petitioner filed several Marsden[2]
motions to relieve his series of appointed lawyers and several Faretta[3] motions seeking to
represent himself.  CT 45-50, 55-60, 64-69 (Marsden motions); CT 75-79, 82-85, 89-93 (Faretta
motions).  The court gave petitioner a written advisement, which petitioner filled out and filed
with the court.  In it petitioner acknowledges his understanding of his legal rights, the advantages
of having a lawyer, the disadvantages of self-representation, and the nature of the charges and the
possible consequences.  CT 105-109 (Faretta advisement and waiver).  At the hearing on
February 28, 2000, the court reviewed these topics with petitioner, who affirmed his
understanding of the problems attendant upon self-representation.  2/28/00 RT 4-9.  The court
warned petitioner that "if you represent yourself and then you engage in the acting-out behavior
which unfortunately you have done time and time again, that you'd be removed from the
courtroom, and there's not going to be anybody here to represent you."  2/28/00 RT at 5.  Later,
the court asked petitioner "what can you tell me to cause me to believe you when you tell me you
are not going to act out in the future?"  Petitioner said:

> Well, just my word and the fact that I've – I have acted
> inappropriately in your courtroom, but at the same time, I realize it
> hasn't done any good for me.  If anything, it's made things worse,
> and I'm not planning on trying to make anything worse than they
> already are.

2/28/00 RT 9.  The prosecutor objected "primarily based on his disruptiveness."  Id.  Defense
counsel also urged the court not to grant the motion because of "the complicated nature of this
case, there's also an NGI defense . . . ."  2/28/00 RT 10.  Petitioner interjected that his "behavior
in court and what takes place in prison is two separate different things."  Id. at 11.  The court
mused that it "want[ed] to make sure that we give Mr. Diesso all his constitutional rights and not

---

    [2]  People v. Marsden, 2 Cal.3d 118 (1970).

    [3]  Faretta v. California, 422 U.S. 806 (1975)

1    just the one that talks about representing himself.  I want to make sure that he has a fair and

2    impartial shot at this whole situation." Id. at 12.  Once again, petitioner interjected:

3               If the Court feels uncomfortable with me being in here, if I were to
                represent myself, I can always be placed in the holding tank, and I
4               can hear just as very clearly as if I was standing here.  And the
                bailiff can run the papers back and forth, because they've done that
5               on other cases where there was disruptions in other courtrooms
                where the person that went pro per.  So I feel that if that is the
6               issue, I can – I have no problem being placed in there or being put
                on the electric belt or whatever makes the Court happy.

7

8    Id. at 12-13.  The court then ruled:

9               As I say, you know, we are trying to balance your constitutional
                rights to represent yourself and trying to balance whether or not
10              this is the best thing for you and whether or not it's something that
                the Court should allow.

11
                The concern the Court obviously has is the fact that, in this Court's
12              opinion, the best predictor of future behavior is past behavior.  We
                have a situation where even in the CDC, which is a very highly
13              controlled environment and much safer for everybody than this
                courtroom, you have not conducted yourself according to the rules.
14
                While in my court on several occasions, you've acted out and
15              attempted to assault your attorney.  You've been violent.  I've had
                to remove you from the courtroom and place you in the holding
16              cell next to my courtroom, and you acted out so much there, if
                memory serves correctly, we had to remove you from this floor, so
17              we could conduct further hearings in your case.

18              You have acted out in such a way that I don't find your statement
                that you will not act out in the future to be credible.  I find based
19              upon my personal observations of you that you engage in
                purposeful behavior when you believe it somehow is going to
20              benefit you.  And it's this Court's opinion that your acting out has
                been entirely based upon your own specific intent to disrupt this
21              court and to build error into the record.

22              To allow you to represent yourself would be, in this Court's
                opinion, a huge mistake.  It's obvious that you are not competent to
23              represent yourself.  If you take the records in these proceedings
                since they began in its entirety, they clearly demonstrate that you
24              are not competent to represent yourself.  I'm satisfied clearly that
                you are mentally competent and that you've been fully informed of
25              your right to counsel.  But I'm not satisfied that you really
                understand what I've told you and what the consequences of your
26              contemplated act to represent yourself are.

9

1    I specifically find that you have not intelligently and voluntarily
     waived your right to counsel, and to allow the defendant to attempt
2    to represent himself would be a farce and a sham.  So the motion is
     denied.
3

4    Id. at 13-14.   Petitioner raised the issue on appeal from his conviction.  The Court of Appeal

5    rejected his claim:

6        Defendant contends that the trial court erred in basing its denial of
         the motion on the finding that his waiver was not knowing and
7        intelligent.  Faretta holds that a defendant has the right under the
         Sixth and Fourteenth Amendments to waive counsel and represent
8        himself or herself.

9        The record is clear that the trial court believed that defendant
         would disrupt the court proceedings, and found that to allow him to
10       represent himself "would be a farce and a sham."  Defendant
         asserts that the basis of the trial's [sic] court's ruling was that the
11       defendant's waiver was not knowing and intelligent.  The court
         made its finding in the context of its grave concern that the
12       defendant would continue to disrupt the proceedings.

13       This basis alone would suffice to support the trial court's
         conclusion that defendant could not represent himself, and a ruling
14       will be upheld if it was correct on any basis.

15       A defendant who chooses self-representation must be able and
         willing to abide by procedural rules and courtroom protocol.  "The
16       right of self-representation is not a license to abuse the dignity of
         the courtroom," and self-representation may be terminated when a
17       defendant engages in "serious and obstructionist misconduct."  The
         California Supreme Court has held that the trial court may deny a
18       motion for self-representation if it has a reasonable basis for
         believing that self-representation will create a disruption.  "Thus, a
19       trial court must undertake the task of deciding whether a defendant
         is and will remain so disruptive, obstreperous, disobedient,
20       disrespectful or obstructionist in his or her actions or words as to
         preclude the exercise of the right to self-representation."  The trial
21       court's decision to terminate a defendant's right to self-
         representation is reviewed for abuse of discretion, and the Welch
22       court held the same deference should be applied "when it comes to
         deciding whether a defendant's motion for self-representation
23       should be granted in the first instance."

24       Our review of the record reveals numerous pretrial proceedings at
         which defendant was seriously disruptive.  On one occasion he
25       refused to leave his prison cell to appear for a readiness
         conference, and the court was forced to continue the conference.
26       In addition to the incidents cited by the trial court in its ruling on

10

1  the *Faretta* motion, the defendant had physically lunged at his
   attorney and "head-butted" him, spit on the bailiff, used foul
2  language, and refused to speak when addressed directly by the
   court.  "We are also aware that the extent of a defendant's
3  disruptive behavior may not be fully evident from the cold record,
   and that one reason for according deference to the trial court is that
4  it is in the best position to judge defendant's demeanor.  Thus
   while no single one of the above incidents may have been
5  sufficient by itself to warrant a denial of the right of self-
   representation, taken together they amount to a reasonable basis for
6  the trial court's conclusion that defendant could or would not
   conform his conduct to the rules of procedure and courtroom
7  protocol, and that his self-representation would be unacceptably
   disruptive."  There was no abuse of discretion in the trial court's
8  denial of the *Faretta* motion here.

9  Answer, Ex. A at 20-22.

10      Both courts' observations of petitioner's behavior is borne out by this court's

11  review of the record.  The following incidents occurred before the court denied petitioner's

12  <u>Faretta</u> requests:

13      •   On April 12, 1999, the transcript reports that "the defendant makes
            physical contact with Mr. Moe [his lawyer at that time] and is restrained."
14          Before petitioner was removed from the holding cell, he said, "I'll tell you
            right now, fool.  This ain't going down, mother fucker.  It ain't going
15          down, punk."  He then yelled from the holding cell, "Hey, your ass is
            mine, Moe.  Put that on the record."  4/12/99 RT 5.
16
17      •   On May 6, 1999, after an evaluation of petitioner's competence to stand
            trial, petitioner interrupted the proceeding, prompting the court to ask, "Do
            we have any duct tape, gentlemen?  Do you have something to gag him,
18          because I'm not going to put up with this."  5/6/99 RT 10.[4]  Later in the
            same hearing, a <u>Marsden</u> hearing, the court described petitioner's
19          demeanor in this fashion:  "He comes out of my holding cell acting like an
            animal.  He hears me say to the correctional officer, "Do you have any
20          duct tape. . . ." and he immediately stops.  There's nothing wrong with this
            gentleman.   This is all feigned. . . . and if he thinks that he's going to
21          manipulate the legal system, it's not going to happen."  <u>Id</u>. at 11.  As the
            hearing continues, the court reporter noted petitioner "burping" and
22          "making noises."  <u>Id</u>. at 12, 13.  This prompted the court to direct
            petitioner to be put in the holding cell.  <u>Id</u>. at 13.

23  /////

24  /////

25  ─────────────────────────

26      [4]  The May 6, 1999 transcript immediately follows that of the proceedings on April 13,
    1999.

11

1    •    The minutes for petitioner's arraignment on August 19, 1999 note,
2         "Defendant became verbally + physically assaultive, he was removed from
          the courtroom + placed into a holding cell adjacent to the courtroom."  CT
3         15.  During the sanity phase of the trial, correctional officer Pappa
          described what had occurred: "I observed Mr. Diesso lunge toward his
4         attorney, Mr. Oldwin, and head-butt him on the left side of his face.  And
          after that, he was grabbed by the correctional staff and carried out of the
5         courtroom.  And just prior to being carried out of the courtroom, he turned
          and spat on the bailiff."  RT 486.

6    B.   Analysis

7         In Faretta, the Supreme Court held that a criminal defendant has a Sixth

8    Amendment right to represent himself at trial after a knowing and voluntary waiver of the right to

9    counsel and a trial court lacks discretion to deny a request so long as it is knowing, voluntary,

10   and timely.  422 U.S. at 835.

11        In this case, petitioner argues that the trial court did not properly apply the Faretta

12   standards, for it found he was mentally competent to represent himself yet also found that he had

13   not validly waived his right to counsel.  The Court of Appeal found that the denial was based not

14   on an invalid waiver, but on the potential for disruption if petitioner represented himself.

15        In Hirschfield v. Payne, 420 F.3d 922 (9th Cir. 2005), the petitioner had made two

16   motions to represent himself.  The first had been denied as made for the purpose of delay, while

17   the second was denied because the petitioner was unfamiliar with legal procedures.  Id. at 927-

18   28.  The Ninth Circuit found the first denial proper, but the second was not.  It recognized that

19   had the second judge been aware of the prior ruling, he could have denied the second motion "on

20   the separate ground that it was intended to cause delay."  Id. at 928.  However, the court

21   recognized it could not deny habeas relief on the basis of "a hypothetical justification not actually

22   relied on by the trial court."  Id.  It refused to " posit[] an alternative reason for the state court's

23   decision . . .where the record reveals the state court did not base its decision on that alternative

24   reason."  Id. at 929; see also  Van Lynn v. Farmon, 347 F.3d 735, 741 (9th Cir. 2003), cert.

25   denied sub nom. Mitchell v. Van Lynn, 541 U.S. 1037 (2004) (refusing to uphold Faretta denial

26   on grounds of timeliness when state court had used lack of competence; court would not "invent

an alternative rationale for the state court's decision which requires application of an entirely different and unrelated legal principle" and then uphold the decision based on the alternative rationale).

This case is not like Hirschfield and Van Lynn. Although the trial court said petitioner had not validly waived his right to counsel, the Court of Appeal found that denial of the Faretta motion was made "in the context" of the potential for disruption and found the denial proper on that basis. The trial court did more that "initially express concern" about the potential for disruption; the focus of its explanation was on the earlier disruptions and the predictive value of those episodes. Accordingly, unlike Hirschfield and Van Lynn, this court need not "invent an alternative rationale for the state court's decision" and may analyze the denial in the context of petitioner's disruptive behavior.

The Faretta court observed:

> We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. . . .
>
> The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. . . .

Faretta, at 834 n.46. Moreover, as the Court has observed, the "government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." Martinez v. California, 528 U.S. 152, 162 (2000). The Fourth Circuit has explained:

> A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel.

United States v. Frazier-El, 204 F.3d 553, 560 (4th Cir. 2000).

1    In this case, the court did not terminate petitioner's right to represent himself, but

2  rather denied his request based on the potential for disruption of the proceedings.  This is not an

3  unreasonable application of clearly established federal law.

4    In United States v. Flewitt, 874 F.2d 669 (9th Cir. 1989), the court granted the

5  defendants' requests to represent themselves in a federal mail fraud prosecution, but thereafter

6  denied their repeated requests to be transported to a warehouse to inspect and categorize boxes of

7  documents they claimed were relevant to their defense.  At a status hearing a week before trial,

8  defendants renewed their request.  In response, the judge terminated their pro se status, finding

9  that they had refused to prepare for trial and so were incapable of representing themselves.  Id. at

10  672.  The Ninth Circuit reversed:

11

12        Pretrial activity is relevant only if it affords a strong indication that
          the defendants will disrupt the proceedings in the courtroom.  The
          Supreme Court never suggested that the defendant's right to self-

13        representation could be terminated for failure to prepare properly
          for trial.  Rather, it stated that [t]he right of self-representation is

14        not a license to abuse the dignity of the courtroom.

15  Id. at 674 (internal quotations omitted).

16    In United States v. Brock, 159 F.3d 1077, 1079 (7th Cir. 1998), the court

17  terminated the defendant's pro se status before trial after he repeatedly refused to answer the

18  court's questions, challenged the court's jurisdiction, and demanded a bill of particulars.  He

19  challenged this ruling on appeal.  The Seventh Circuit upheld the conviction:

20        [W]hen a defendant's obstreperous behavior is so disruptive that
          the trial cannot move forward, it is within the trial judge's

21        discretion to require the defendant to be represented by counsel.

22  Id. at 1079.  The court acknowledged the Ninth Circuit's decision in Flewitt, but noted:

23        In Flewitt, the defendants' conduct merely affected the defendants'
          chance of prevailing at trial; it did not prevent the trial from

24        proceeding.  In contrast, Brock's steadfast refusal to answer the
          court's questions made it extremely difficult for the court to

25        resolve threshold issues, such as whether the defendant would be
          represented by counsel.  Brock did not simply refuse to prepare for

26        trial, he refused to cooperate, even minimally, with the court.

14

1
2
3

> Furthermore, Brock's obstructionist conduct persisted even after several contempt citations. It was, therefore, reasonable for the trial court to conclude that Brock's behavior strongly indicated that he would continue to be disruptive at trial.

4   Id. at 1080-81 (footnote omitted).

5           As Brock and Flewitt recognize, when pretrial behavior strongly indicates that a

6   defendant will be disruptive at trial, a court is justified in revoking that defendant's pro se status

7   before trial.   Nothing in these cases, or in Faretta itself, suggests that a trial judge must first

8   permit a defendant to proceed pro se before relying on the predictive power of his prior behavior

9   to determine that the pro se defendant would disrupt the trial.

10          In Marshall v. Taylor, 395 F.3d 1058 (9th Cir.), cert. denied, ___ U.S. ___, 126

11  S.Ct. 139 (2005), the Ninth Circuit considered the interaction between state and federal rulings

12  concerning the timeliness of a Faretta request.  It noted:

13
14
15

> The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is Supreme Court precedent existing at the time of the state court's decision.  Supreme Court precedent includes not only bright-line rules it establishes but also the legal principles and standards flowing from them.

16  Id. at 1060.  The court noted that Supreme Court guidance on "the permissible timing of a Faretta

17  request is scarce," and concluded:

18
19
20

> Because the Supreme Court has not clearly established when a Faretta request is untimely, other courts are free to do so as long as their standards comport with the Supreme Court's holding that a request "weeks before trial" is timely.

21  Id. at 1061.

22          This case is similar, in that Supreme Court precedent on the question of when a

23  disruptive defendant's request to represent himself may be revoked or denied is scarce.  The

24  California Supreme Court has concluded that "the same rule" concerning the termination of the

25  right of self-representation of an obstructionist defendant

26  /////

1    applies to the denial of a motion for self-representation in the first
     instance when a defendant's conduct prior to the *Faretta* motion
2    gives the trial court a reasonable basis for believing that his self-
     representation will create disruption.
3

4    People v. Welch, 20 Cal.4th 701, 735 (1999).  The Court of Appeal relied on Welch in reaching

5    its decision in this case.  Answer, Ex. A at 21.

6           The Welch court's holding comports with Faretta and with Brock and Flewitt's

7    recognition of the predictive value of pretrial behavior.   The Court of Appeal's determination

8    therefore is neither contrary to nor an unreasonable application of the "principles and standards"

9    flowing from Faretta.  Moreover, the court did not make an unreasonable factual determination

10   by relying on petitioner's earlier disruptions as establishing the "strong indication" that he would

11   use his pro se status to continue his obstructionist behavior.  The record shows his disruptions

12   were serious and continued even after he was removed from the courtroom.  There was no

13   federal constitutional error.

14   IV.  Jury Instruction On Mental State

15          In California, "all murder which is perpetrated by means of . . . lying in wait" or is

16   "willful, deliberate, and premeditated" is first degree murder.  Cal. Pen. Code § 189.  In this case,

17   the prosecutor proceeded on these two theories in pursuing the first degree murder charge against

18   petitioner.  See RT 336-338.

19          Petitioner argues that CALJIC No. 3.32, the jury instruction on mental state, failed

20   to inform the jury it could consider evidence of petitioner's mental illness in determining the

21   mental state of lying in wait and did not make it clear to the jurors that evidence of petitioner's

22   mental illness need only raise a reasonable doubt as to the existence of the required mental states.

23          The trial court instructed the jury:

24          You have received evidence regarding a mental disease, mental
            defect or mental disorder of the defendant at the time of the
25          commission of the crime charged, namely, murder in Count 1 or
            lesser crimes thereto, namely, murder in the second degree and
26          voluntary manslaughter.  You should consider this evidence solely

                                            16

for the purpose of determining whether the defendant actually formed the specific intent, premeditated, deliberated or harbored malice aforethought, which are elements of the crime charged in Count 1, namely murder.

RT 385.   The Court of Appeal rejected petitioner's challenge:

Lying in wait is one form of deliberate and premeditated murder. A showing of lying in wait obviates the necessity of separately proving premeditation and deliberation.  In other words, lying in wait is the functional equivalent of proof of a premeditated, deliberate intent to kill.

The jury was first instructed with CALJIC No. 8.25, which was given without modification.  It defined the state of mind for lying in wait as "equivalent to premeditation and deliberation." . . .[5]  The jury was then instructed with CALJIC No. 3.32, as modified by the court.  CALJIC No. 3.32 instructed the jury that it could consider defendant's mental state in determining whether he premeditated or deliberated.  The jury also received the standard instruction that as to the murder charge, "there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator.  Unless this mental state exists the crime to which it relates is not committed."  Together, these instructions advised the jury that defendant's mental disorder was relevant to its consideration of whether he had the required mental state for murder; because lying in wait is equivalent to premeditation, CALJIC No. 3.32 necessarily included it in the mental states as to which defendant's mental disorder could be considered.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant further faults the instruction on the basis that it failed to make clear that the evidence of mental defect "need only be

_____

[5]  The 8.25 instruction as given read:

Murder which is immediately preceded by lying in wait is murder of the first degree.  The term lying in wait is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise, even though the victim is aware of the murderer's presence.  The lying in wait need not continue for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

RT 382; CT 389.

1         capable of raising a reasonable doubt about the existence of the
required mental states," thereby depriving defendant of his
2         constitutional right to require that every element of his crime be
proved beyond a reasonable doubt.  We disagree.  The jury was
3         instructed that the prosecution's burden was to prove the case
beyond a reasonable doubt and, specifically, that each piece of
4         prosecution evidence must be proved beyond a reasonable doubt.
Defense counsel argued reasonable doubt in his closing, including
5         a specific argument that the jury must be convinced beyond a
reasonable doubt that defendant had the requisite intent for the
6         crimes.  The burden was clear.

7         Here the question is whether there is a reasonable likelihood that
the jury understood the charge as the defendant asserts. (*People v.*
8         *Kelly* (1992) 1 Cal.4th 496, 525, quoting *Estelle v. McGuire* (1991)
502 U.S. 62, 72-73 & fn. 4.)  We conclude there is no reasonable
9         likelihood that the jury understood it could not apply the evidence
of mental disorder to the lying in wait instruction, or understood
10         the instruction to abrogate the prosecution's burden of proof.

11 Answer, Ex. A at 17-20 (internal quotations and most citations omitted).

12         A challenge to jury instructions does not generally state a federal constitutional

13 claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456

14 U.S. 107, 119 (1982)).  In order to warrant federal habeas relief, a challenged jury instruction

15 cannot be merely "undesirable, erroneous, or even universally condemned, but must violate some

16 due process right guaranteed by the fourteenth amendment."  Cupp v. Naughten, 414 U.S. 141,

17 146 (1973).  Moreover, "not every ambiguity, inconsistency, or deficiency in a jury instruction

18 rises to the level of a due process violation."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).

19 An ambiguous jury instruction creates constitutional error if "there is a reasonable likelihood that

20 the jury has applied the challenged instruction in a way that prevents the consideration of

21 constitutionally relevant evidence," or otherwise "in a way that violates the Constitution."  Boyde

22 v. California, 494 U.S. 370, 380 (1990) (instruction on mitigating evidence in a capital case);

23 Estelle v. McGuire, 502 U.S. 62, 72 (1991) (adopting Boyde test for other challenges to

24 ambiguous jury instructions).  In making this determination,  a single instruction "may not be

25 judged in artificial isolation, but must be viewed in the context of the overall charge."  Boyde,

26 494 U.S. at 378.

1  /////

2           A.  <u>Mental State Evidence And Lying In Wait</u>

3          In California, evidence of a defendant's mental illness, defect or disorder is

4  admissible "on the issue of whether or not the accused actually formed a required specific intent,

5  premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is

6  charged."  Cal. Pen. Code § 28(a).  Petitioner presented such evidence in the guilt phase and the

7  jury was instructed to consider it "solely" when evaluating whether he "actually formed the

8  specific intent, premeditated, deliberated or harbored malice aforethought."  RT 385.  Petitioner

9  argues the use of the word "solely" and the failure to list lying in wait as one of the mental states

10  covered by the instruction prevented the jury from considering the evidence of petitioner's

11  mental state when evaluating whether he was guilty of first degree murder on a theory of lying in

12  wait.

13          As the Court of Appeal noted and the jury in this case was instructed, proof of

14  lying in wait "acts as the functional equivalent of proof of premeditation, deliberation and intent

15  to kill."  <u>See</u> <u>People v. Ruiz</u>, 44 Cal.3d 589, 614 (1988).  An equivalent is something "having

16  equal or corresponding import, meaning, or significance: chiefly of words and expressions," or

17  "that is virtually the same thing; identical in effect; tantamount."  Oxford English Dictionary

18  Online at <http://dictionary.oed.com> (accessed 8/21/06).  Accordingly, the jury was told to

19  consider the evidence of petitioner's mental illness solely in connection with its determination

20  whether petitioner possessed the necessary mental states of premeditation and deliberation and

21  was told that lying in wait was "of equal meaning" and "virtually the same thing" as

22  premeditation.  Given the equivalence of the terms, the use of the word "solely" in CALJIC No.

23  3.32 did not prevent the jury from considering the evidence of petitioner's mental illness in

24  connection with the theory of lying in wait.  The Court of Appeal's decision did not unreasonably

25  apply clearly established federal law.

26  /////

1   /////

2              B.  Raising A Reasonable Doubt

3              Petitioner argues that the instruction failed to inform the jury that his evidence of

4   mental illness could be the basis of a different verdict if it merely raised a reasonable doubt about

5   whether the prosecution had met its burden and that this deprived him of his right to hold the

6   prosecution to its burden of proving every element beyond a reasonable doubt.

7              The "clearly established federal law" against which this claim must be measured

8   is In re Winship, 397 U.S. 358 (1970), which recognized that the due process clause requires

9   "proof beyond a reasonable doubt" of every element necessary to a finding of guilt.  A jury

10  instruction that, in context, fails to give effect to that requirement violates a defendant's

11  constitutional rights.  Bruce v. Terhune, 376 F.3d 950, 955 (9th Cir. 2004).   However, as with

12  most claims of jury instructional error, this claim must be evaluated in the context of the

13  instructions as a whole.  Boyde, 494 U.S. at 378.

14             Here, the jury was instructed that

15             each fact which is essential to complete a set of circumstances
               necessary to establish the defendant's guilt must be proved beyond
16             a reasonable doubt.  In other words, before an inference essential to
               establish guilt may be found to have been proved beyond a
17             reasonable doubt, each fact or circumstance on which the inference
               necessarily rests must be proved beyond a reasonable doubt.
18
19             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

20             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

21             A defendant in a criminal action is presumed to be innocent until
               the contrary is proved, and in case of a reasonable doubt whether
22             his guilt is satisfactorily shown, he is entitled to a verdict of not
               guilty.  This presumption places upon the People the burden of
23             proving him guilty beyond a reasonable doubt.

24             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

25             In the crime charged in Count 1. . . there must exist a union or joint
               operation of act or conduct and a certain specific intent in the mind
26             of the perpetrator.  Unless this specific intent exists, the crime to
               which it relates is not committed.

1     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2        In the crime charged in Count 1. . . there must exist a union or joint
operation of act or conduct and a certain mental state in the mind

3        of the perpetrator.  Unless this mental state exists, the crime to
which it relates is not committed.

4

5 RT 369, 378, 379; CT 362, 381, 382, 383.  These instructions informed the jury of the

6 prosecution's burden in general and on the issues of intent and mental state.  The Court of

7 Appeal did not apply federal law in an unreasonable fashion in rejecting this claim of error.

8        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

9 writ of habeas corpus be denied.

10        These findings and recommendations are submitted to the United States District

11 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

12 days after being served with these findings and recommendations, any party may file written

13 objections with the court and serve a copy on all parties.  Such a document should be captioned

14 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15 shall be served and filed within ten days after service of the objections.  The parties are advised

16 that failure to file objections within the specified time may waive the right to appeal the District

17 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18 DATED:  August 22, 2006.

19

20

21                  UNITED STATES MAGISTRATE JUDGE

22

23

24 2/dies2485.157

25

26